## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| Daniel Mulhern, individually and on behalf of all others similarly situated, | |
| Plaintiff, | Civil Case No. |
| vs. | |
| Pepperidge Farm, Inc., | |
| Defendant. | |

## CLASS ACTION COMPLAINT

### INTRODUCTION

1.     Plaintiff Daniel Mulhern ("Plaintiff" or "Mulhern"), individually and on behalf of other similarly situated persons, seeks to recover from Defendant Pepperidge Farm, Inc. ("Defendant" or "Pepperidge Farm") damages arising from its unlawful misclassification of him and other so-called Sales Development Associates ("SDAs") working for Pepperidge Farm as independent contractors, rather than employees.

2.     During the nineteen years preceding the filing of this complaint, Mulhern worked for Pepperidge Farm in Illinois as a so-called SDA pursuant to a standard form Consignment Agreement, described below, a copy of which is attached as Exhibit A (the "Consignment Agreement"). Plaintiff performed critical aspects of Pepperidge Farm's business by delivering its products to stores and other Pepperidge Farm merchandisers and customers, stocking displays of those products in such stores, merchandising the products, promoting the products, and returning the products to Pepperidge Farm when they were not sold.

3.      Under its contracts with its Illinois SDAs, Pepperidge Farm has the right to control and direct the performance of their work. Pepperidge Farm in fact regularly exercises such control and direction over those SDAs.

4.      The services that the Illinois SDAs perform for Pepperidge Farm constitute a regular and continuing part of Pepperidge Farm's usual business, which is the manufacture, marketing, sale, and distribution of biscuit and bakery products across the United States, including in Illinois.

5.      The SDAs depend solely on Pepperidge Farm for the work they are performing under their contract with it. The SDAs are therefore not conducting an independently established trade, occupation, profession or business.

6.      As set forth below, Pepperidge Farm's misclassification of its Illinois SDAs as independent contractors rather than employees constitutes a violation of the Illinois Wage Payment and Collection Act, 820 Ill. Com. Stat. 115/9.

7.      In this action, Plaintiff seeks on behalf of himself and other SDAs operating in Illinois to recover damages suffered as a result of Pepperidge Farm's illegal misclassification of them as independent contractors, including: (a) illegal deductions that Pepperidge Farm made from their wages or compensation in violation of the Illinois Wage Payment and Collection Act, 820 Ill. Com. Stat. 115/9, (b) overtime wages that Pepperidge Farm deprived them of in violation of the Illinois Minimum Wage Law, 820 Ill. Comp. Stat. 105/4a, and (c) business expenses that Pepperidge Farm improperly shifted onto them, resulting in Pepperidge Farm's unjust enrichment.

## JURISDICTION

8.      The Court has personal jurisdiction over the Defendant because it does business in the State of Illinois, and because the conduct complained of occurred in the State of Illinois.

9.      The Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. 1332(d)(2).  Plaintiff's individual claim exceeds $75,000, and the Class' claim exceeds $5 million.

## THE PARTIES

10.      Plaintiff Mulhern is a resident of Western Springs, Illinois. From approximately 1996 through 2015, he worked for Pepperidge Farm as an SDA in Illinois.

11.      Defendant Pepperidge Farm is a Connecticut corporation with its principal place of business in Norwalk, Connecticut. It regularly conducts business in Cook County and elsewhere in Illinois and operates facilities in various other parts of the state.

## FACTUAL ALLEGATIONS

12.      Pepperidge Farm manufactures, markets, sells, and distributes biscuit and snack products (cookies and crackers) and bakery products (bread, rolls, stuffing, and croutons) throughout the United States, including in Illinois.

13.      Pepperidge Farm typically sells its products to grocery stores, convenience stores, mass merchandisers, military commissaries, and other retail stores.  As an integral part of its business, Pepperidge Farm relies on its SDAs to get its products to market.  These individuals deliver, stock, merchandise, promote, and remove Pepperidge Farm products at the store level, within defined territories.

14.      Plaintiff and other SDAs performed delivery, stocking, merchandising, promotional, and removal services on behalf of Pepperidge Farm in Illinois.

15.    In order to perform such work, Pepperidge Farm first required Plaintiff and the other SDAs to sign the Consignment Agreement.

16.    The Consignment Agreement entitles SDAs to compensation for the services that they perform for Pepperidge Farm.

17.    The Consignment Agreement signed by Plaintiff Mulhern as "Consignee" and attached hereto as Exhibit A is substantially similar in substance to the Consignment Agreements signed by every putative Class Member whom the Plaintiff seeks to represent in this action.

18.    The Consignment Agreements purport to describe the SDAs as "independent contractors."

19.    Such Agreements are one-sided contracts of adhesion drafted exclusively by Pepperidge Farm. The SDAs have no meaningful opportunity to negotiate any of the Agreements' terms and are instead required to accept such terms on a "take it or leave it" basis.

20.    Pepperidge Farm also requires its SDAs to agree to various "policies" in connection with their work under the Consignment Agreements, including without limitation policies governing handheld computer and other equipment, palletized delivery of certain product, and stale or damaged product, which are discussed further below. As with the Consignment Agreements, the SDAs have no meaningful opportunity to negotiate any of the terms of these policies and are instead required to accept such policies on a "take it or leave it" basis.

21.    Under the Consignment Agreements, Pepperidge Farm uniformly retains and carries out a substantial degree of control and direction over the Plaintiff and its other SDAs operating in Illinois in numerous ways, including (but not limited to) the following:

a. The SDAs are required to deliver products to the locations designated by Pepperidge Farm and to "accept sufficient quantities of Consigned Products to maintain at all times an adequate and fresh supply thereof in all retail stores in the Territory which request such products…."  Consignment Agreement ¶ 2.

b. The SDAs are required to hold and care for all Consigned Products, which are deemed to be the "sole and exclusive property" of Pepperidge Farm.  Id.

c. The SDAs may not grant any security interest in or lien on such products.  Id.

d. The SDAs must keep records of all products received by them from Pepperidge Farm and all sales and deliveries of such products that they make pursuant to Pepperidge Farm's instructions.  Id. at ¶¶ 3(e).  The Consignment Agreements give Pepperidge Farm the right to inspect such records at any time and the right to take physical inventory of any products in the SDAs' possession whenever Pepperidge Farm wishes to do so.  Id.

e. The Consignment Agreements also require the SDAs to use their "best efforts to realize the full sales potential" of their assigned Territories, id. at ¶ 4, which means that each SDA must do all of the following:

    i. "actively solicit all retail stores in the Territory whose accounts can be profitably handled";

    ii. "maintain at all times an adequate and fresh supply of Consigned Products in all such retail stores";

    iii. "provide distribution service to all such retail stores on such days of the week (including weekends), at such intervals and with such frequency as

is necessary to realize the full sales potential thereof and to maintain an adequate and fresh supply of Consigned Products therein";

iv. "make available to all such retail stores all varieties of authorized Consigned Products unless it is demonstrably unprofitable to do so";

v. "cooperate with [Pepperidge Farm] in the effective utilization of [its] advertising, sales promotion and space merchandising programs"; and

vi. "keep fully informed of [Pepperidge Farm's] recommended policies and methods for increasing sales and improving distribution service." Id.

f. Under the Consignment Agreements, Plaintiff and other SDAs are prohibited from distributing any products that are competitive with Pepperidge Farm's products "without the prior written consent of [Pepperidge Farm.]" Id.

g. Pepperidge Farm reserves the right at any time to "establish reasonable sales and/or distribution goals" for the SDAs, in which case the SDAs must "either meet or exceed such goals." Id.

h. The SDAs must provide and maintain a delivery truck and computer meeting specifications dictated by Pepperidge Farm, together with such other equipment that Pepperidge Farm deems necessary for the operation of the SDA's business. Id. at ¶ 5.  The SDAs must maintain the general appearance and condition of such equipment and the "appearance and deportment" of the SDA and any helpers, in accordance with the "established reputation" of Pepperidge Farm.  Id.

i. The SDAs are strictly limited with regard to both to whom they may sell or deliver product and the products that they may sell or deliver.  Id. at ¶ 9.

j.  The SDAs must obtain, at their own expense, public liability and property damage insurance to protect both Pepperidge Farm and the SDA against certain claims. Id. at ¶ 13.

k.  The SDAs must obtain Pepperidge Farm's express, prior written approval before selling their routes.  Id. at ¶ 19.

l.  Pepperidge Farm retains the right to decide who can become an SDA, and the right to reject SDA applicants and proposed transfers of routes or the proposed "splitting" of routes. Id. at ¶ 19.

22.    Pepperidge Farm's practices throughout Illinois are consistent with the foregoing provisions of the Consignment Agreements.

23.    In practice, Pepperidge Farm uniformly exerts substantial control and direction over its SDAs in numerous ways, examples of which include the following:

a.  Pepperidge Farm unilaterally dictates the amount of products the Plaintiff and other SDAs are required to deliver to each customer.

b.  Pepperidge Farm unilaterally determines the retail sales price for each product delivered by the Plaintiff and other SDAs.  Plaintiff and the other SDAs are not permitted to have any input into these price determinations.

c.  SDAs are required to report to a Pepperidge Farm facility every morning, a set number of days a week, at which time they are provided with the products that Pepperidge Farm has decided they should deliver.  Plaintiff Mulhern reported to a warehouse in La Grange, Illinois until approximately 2004, at which point he was required by Pepperidge Farm to report to a Pepperidge Farm warehouse in Naperville, Illinois. In or about 2006, Pepperidge Farm required Mulhern to return

7

to the La Grange warehouse. In or about 2012, Pepperidge Farm required Mulhern to move to a warehouse in Alsip, Illinois.  Upon information and belief, Pepperidge Farm operates similar additional warehouse facilities throughout the state of Illinois.

d.  SDAs are required to comport with Pepperidge Farm's code of appearance and conduct.

e.  Pepperidge Farm tells the SDAs the number of days per week they must deliver food products to each store location, and carefully tracks whether the SDAs have complied with the schedule set by it.

f.  Whenever a Pepperidge Farm product is on discounted sale at a particular store location, Pepperidge Farm requires that the SDAs deliver the sale product on the same day as the sale is scheduled to begin.  Pepperidge Farm unilaterally determines when each sale will occur, as well as the store location where each sale takes place, and carefully tracks whether the SDAs have made such deliveries in a timely fashion.

g.  Pepperidge Farm requires SDAs to visit designated store locations on at least one or two non-delivery days each week, in order to stock shelves and ensure correct product placement, and carefully tracks whether the SDAs have complied with the schedule set by it.

h.  Because no products are transported on non-delivery days, SDAs drive to the store locations designated by Pepperidge Farm in their smaller personal vehicles, rather than in their delivery trucks, which, being larger, are more expensive to operate.

i.  Pepperidge Farm creates and provides to SDAs certain "plan-o-grams," which are photographic depictions of precisely how the SDAs should display the products that they deliver in the stores.

j.  Pepperidge Farm requires the Plaintiff and other SDAs to display the products they deliver to stores in strict conformity with the "plan-o-grams."

k.  Pepperidge Farm requires each SDA to purchase and pay to maintain a specialized hand-held computer and printer that the SDAs must have on their persons at all times.  Pepperidge Farm requires each SDA to use this device to transmit and receive detailed information regarding the performance of services by the SDAs, including placing orders; managing inventory; providing details on each product delivery, such as which products were delivered to whom, where, and when; receiving information on product prices and promotions; recording stale or damaged product; generating invoices; and communicating with Pepperidge Farm, such as with respect to scheduling.

l.  Pepperidge Farm requires SDAs to own or lease a delivery truck that meets specifications determined by Pepperidge Farm.

m.  Pepperidge Farm carefully monitors the activities of its SDAs for both quality assurance and efficiency purposes.

n.  Pepperidge Farm employs common disciplinary practices to ensure that the SDAs comply with all of Pepperidge Farm's mandates. These practices include the issuance of warning letters (also known as "five day letters") that are routinely sent to "under-performing" SDAs. Plaintiff Mulhern and many other SDAs, have

received a number of five day letters over the course of their relationships with Pepperidge Farm.

o. Pepperidge Farm manages SDA performance through its "stale policy." The stale policy allows SDAs to return "out-of-code" (i.e., past the expiration date) or damaged products to Pepperidge Farm for a credit. At the beginning of each quarter, Pepperidge Farm unilaterally sets and advises SDAs of their "stale objective," which is the percentage of stale or damaged product which the SDA may return to Pepperidge Farm for credit. If at the end of the quarter the SDA's returns of stale or damaged product exceed that percentage, Pepperidge Farm will issue a "chargeback" to the SDA, deducting such amount from the SDA's pay for that period. Moreover, if Pepperidge Farm determines in its sole discretion that SDAs have not satisfied certain performance metrics, it may revoke their stale policy privileges. Pepperidge Farm routinely threatens to revoke or actually revokes stale privileges from SDAs in order to control their job performance.

p. Pepperidge Farm also imposes "pallet fees" against SDAs, deducting such fees from their pay. Pepperidge Farm directly delivers products to certain of its customers in palletized form at the customers' warehouses. Although Pepperidge Farm delivers the products to the warehouses, the SDA must nonetheless accept the product and become responsible for the product, in the sense that the SDA must stock and merchandise such product in the customers' stores.

q. Pepperidge Farm charges each SDA a "pallet fee" for all palletized deliveries. Pepperidge Farm purports to justify these fees by pretending that the palletized deliveries were authorized by the SDAs. In practice, however, SDAs have no

10

choice but to accept all palletized deliveries as they risk having Pepperidge Farm unilaterally remove the store from their exclusive territory if they refuse such deliveries. Moreover, in the event that products delivered by pallet become stale or damaged, the SDA is responsible for removing them from the stores, which may subject the SDA to increased chargebacks under Pepperidge Farm's stale policy.

24.    In sum, as described above, Pepperidge Farm uniformly retains and exercises a substantial degree of control and direction over the performance of services by Plaintiff and other SDAs in Illinois.    For this reason alone, in violation of Illinois law, Pepperidge Farm misclassified Plaintiff and other SDAs as independent contractors instead of as employees.

25.    The services that Plaintiff and the other SDAs performed and/or continue to perform in Illinois on behalf of Pepperidge Farm constitute a regular and continuing part of its business.

26.    On its website, http://www.pfroutes.com, Pepperidge Farm represents that the SDAs are "the secret to Pepperidge Farm's success."  SDAs are integral to Pepperidge Farm's business in a variety of ways. For example, Pepperidge Farm develops promotions for Pepperidge Farm products, and works with chain stores to determine which promotions the stores will run. Pepperidge Farm implements its promotions through its SDAs who are required to comply with all Pepperidge Farm promotions.

27.    The Plaintiff and other SDAs deliver, merchandise, and stock the products that Pepperidge Farm sells to its customers from early morning through mid-afternoon. After completing their deliveries or any other physical work that they are required to perform for

Pepperidge Farm, the SDAs submit their daily sales related data through the hand-held computer devices that they are required to purchase by Pepperidge Farm.

28.    Pepperidge Farm uses the sales to data to track every SDA's performance in elaborate detail as well as using this information as a means of assessing its own profitability.

29.    The overwhelming majority of revenue generated by SDAs for Pepperidge Farm is from chain account deliveries as to which SDAs have no independent decision making authority. As a result, SDAs' ability to profit is predicated entirely on the decisions made by Pepperidge Farm's corporate officials. If an SDA believes that a certain product will not sell in a chain store account, the SDA has no authority to remove the product from the store without Pepperidge Farm's permission. For this reason, among others, the SDAs are performing work within Pepperidge Farm's usual course of business and are not conducting an independently established trade, occupation, profession or business.

30.    Likewise, even if SDAs believe that certain Pepperidge Farm products that have not been designated by Pepperidge Farm for chain accounts would be profitably sold by those accounts, unless they obtain prior written permission from Pepperidge Farm they cannot merchandise those products to those accounts.

31.    Pepperidge Farm employs district sales managers ("DSMs") who evaluate the SDAs' performance, and who frequently visit chain stores to conduct store evaluations, promote product placement, and engage in other selling-related activities. In practice, the selling-related activities performed by DSMs are identical to those performed by SDAs, again demonstrating that the SDAs are performing work within Pepperidge Farm's usual course of business.

32.    Each SDA receives multiple store evaluations from his or her respective DSM each year. The store evaluations contain detailed photographs of the SDA's stores, as well as

comments and criticisms related to the SDA's performance, which essentially constitute performance evaluations similar to those that employees typically receive from their employers.

33.    Plaintiff and the other SDAs in Illinois were not, are not, and could not be customarily engaged in any independently established business because they are entirely dependent upon Pepperidge Farm for their work, which consumes all or virtually all of their working days. As such, they wear the "hat" of Pepperidge Farm.

34.    As a practical matter, because Plaintiff and other SDAs are required to "use his/her best efforts to realize the full sales potential" of their assigned territory, it was and is impossible for Plaintiff and the other SDAs to perform work on behalf of any entity other than Pepperidge Farm.

35.    Plaintiff and the other SDAs routinely work 55 - 70 hours per week for Pepperidge Farm simply to fulfill the terms of their contracts.

36.    Plaintiff's and other SDAs' work hours alone establish that Pepperidge Farm misclassified Plaintiff and other SDAs as independent contractors instead of employees in violation of Illinois law.

37.    Pepperidge Farm's misclassification of the Plaintiff and its other SDAs in Illinois as independent contractors instead of employees has damaged them in myriad ways, including: (a) taking unlawful deductions from the SDAs' compensation that were neither freely authorized nor for the benefit of the SDAs, (b) forcing the SDAs to pay certain expenses and charges which, as the employer, Pepperidge Farm should pay, and (c) refusing to provide the SDAs certain benefits which Pepperidge Farm should provide. as the employer,

38.    All deductions that were taken by Pepperidge Farm from the SDAs'
compensation were coerced from the SDAs without their freely given consent at the time of the
deduction.

39.    Unlawful deductions taken by Pepperidge Farm from the SDAs' compensation,
and other expenses which Pepperidge Farm has unjustly required SDAs to bear include the
following:

    a.  stale product charges;

    b.  pallet fees;

    c.  computer, printer, and associated equipment costs, including maintenance and
       service costs;

    d.  insurance costs (including liability and property damage insurance insuring both
       Pepperidge Farm and the SDA);

    e.  truck purchase or lease and maintenance/depreciation costs, and safety inspection
       costs;

    f.  fuel and other mileage-related costs;

    g.  cost of the excise taxes for the trucks;

    h.  expenses associated with using smaller personal vehicles for work on non-
       delivery days; and

    i.  medical costs for periodic doctor's visits to obtain a medical examiner's
       certificate.

40.    The employee benefits that Pepperidge Farm unjustly failed to provide to its
SDAs include the following:

a. the employer's share of certain payroll taxes, including social security and Medicare;

b. sick, vacation, and holiday pay, as well as meal breaks and rest periods; and

c. health insurance and other similar benefits, including without limitation life or disability insurance, Family Medical Leave Act benefits, access to a retirement plan, worker's compensation, and unemployment compensation.

41. Moreover, although the Plaintiff and other SDAs in Illinois routinely worked between 55-70 hours per week, Pepperidge Farm failed to pay them overtime compensation for hours worked in excess of 40 in any week as required by the Illinois Minimum Wage Law.

## CLASS ACTION ALLEGATIONS

42. Plaintiff re-alleges the foregoing paragraphs as if set out here in their entirety.

43. Plaintiff brings this action pursuant to Fed. R. Civ. P. 23 on behalf of himself and a class (the "Class") consisting of:

> All Consignees operating under Consignment Agreements with Pepperidge Farm covering territory in the State of Illinois from February 12, 2006 through the present.

44. This action is properly maintainable as a class action.

45. Upon information and belief, in excess of 150 persons have performed services as SDAs for Pepperidge Farm pursuant to Consignment Agreements during the Class Period. For this reason, joinder of all Class Members would be impracticable.

46. There are numerous questions of law and fact which are common to the Class and predominate over any questions affecting any individual Class Member. These common questions include without limitation the following:

a.   Whether Pepperidge Farm improperly classified the Plaintiff and the Class Members as independent contractors instead of as employees;

b.   Whether Pepperidge Farm took unlawful deductions from the Plaintiff's and Class Members' compensation;

c.   Whether the Plaintiff and Class Members were unjustly required to bear certain expenses that Pepperidge Farm should have paid as their employer;

d.   Whether the Plaintiff and Class Members were unjustly denied benefits of employment, including but not limited to sick, vacation, and holiday pay, meal and rest periods, employer payroll tax contributions, workers' compensation, unemployment insurance, and health insurance and other similar benefits; and

e.   Whether Pepperidge Farm failed to pay the Plaintiff and the Class Members appropriate wages, including overtime wages.

47.   Plaintiff's claims are typical of the claims of the other members of the Class, and the Plaintiff does not have any interests adverse to the Class.

48.   Plaintiff has retained competent counsel experienced in class action litigation. With the advice of their retained counsel, Plaintiff will fairly and adequately protect the interests of the Class.

49.   The prosecution of separate actions against Pepperidge Farm under Illinois law would create a risk of inconsistent or varying adjudications with respect to the individual members of the Class which would result in incompatible standards of conduct for Pepperidge Farm.   In addition, adjudications with respect to individual members of the Class could, as a practical matter, be dispositive of the interests of the other members of the Class who are not

16

parties to such adjudications, or could substantially impede or impair their ability to protect their interests.

50.     A class action is therefore superior to other available methods for the fair and efficient adjudication of the controversy.  There will be no difficulty in managing the case as a class action.

51.     The members of the Class are known to Pepperidge Farm and are readily identifiable through Pepperidge Farm's records.

52.     Pepperidge Farm has acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

### COUNT I – ILLINOIS WAGE PAYMENT AND COLLECTION ACT

53.     Plaintiff incorporates by reference each of the foregoing paragraphs as if set forth fully herein.

54.     Pepperidge Farm violated IWPCA, 820 Ill. Comp. Stat. 115/1 et seq., by taking unlawful deductions from the Plaintiff's and Class Members' compensation, including but not limited to stale charges, pallet fees, and computer and associated equipment charges.

55.     Pursuant to 820 Ill. Comp. Stat. 115/14, Plaintiff and the Class Members seek all unpaid compensation as a result of the unlawful deductions taken from their compensation by Pepperidge Farm, and all legally permissible liquidated damages, statutory damages, prejudgment interest, and any other damages due.

### COUNT 2 – ILLINOIS MINIMUM WAGE LAW

56.     Plaintiff incorporates by reference each of the foregoing paragraphs as if set forth fully herein.

57.     Pepperidge Farm violated IMWL, 820 Ill. Comp. Stat. 105/4a by failing to pay the Plaintiff and Class Members overtime compensation for all hours worked in excess of forty (40) per workweek.

58.     Pursuant to 830 Ill. Comp. Stat. 115/14, Plaintiff and Class Members seek all unpaid overtime compensation, and all legally permissible liquidated damages, statutory damages, prejudgment interest, and any other damages due.

## COUNT 3 - UNJUST ENRICHMENT

59.     Plaintiff incorporates by reference each of the foregoing paragraphs as if set forth fully herein.

60.     As a result of Pepperidge Farm's misclassification of the Plaintiff and Class Members as "independent contractors," the Plaintiff and Class Members are forced to pay substantial sums of money for work-related expenses, including but not limited to the purchase or lease of vehicles, and all costs of operating, insuring, and maintaining those vehicles, which should be borne by Pepperidge Farm.

61.     Further, by misclassifying the Plaintiff and Class Members as "independent contractors", Pepperidge Farm evades employment related obligations, such as payroll tax contributions, workers' compensation coverage, and state disability and unemployment compensation. Pepperidge Farm illegally shifts these costs to the Plaintiff and Class Members.

62.     By misclassifying the Plaintiff and Class Members as "independent contractors," and by further requiring these individuals to pay Pepperidge Farm's own operating expenses, Pepperidge Farm has been unjustly enriched.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court:

I.      Order this action to proceed as a class action under Fed. R. Civ. P. 23, and appointing Plaintiff and his counsel to represent the Class.

II.     Order a certified, independent accounting, at Defendant's expense, of all records in the possession of the Defendant that are relevant to the calculation of the damages sought by Plaintiff in this action, and/or the appointment of a Master or Receiver to determine the correct compensation owed to Plaintiff and Class Members.

III.    Determine the damages sustained by Plaintiff and the Class as a result of Pepperidge Farm's violations of the foregoing statutory and common law, and award those damages against Pepperidge Farm and in favor of Plaintiff and the Class, including all legally permissible liquidated damages, statutory damages, prejudgment interest, and any other damages due.

IV.    Award Plaintiff and the Class costs and disbursements of this suit, including, without limitation, reasonable attorneys' fees and expenses.

V.     Award Plaintiff and the Class pre-judgment and post-judgment interest on all amounts awarded at the highest rate allowable by law; and

VI.   Any other or further relief as the Court may deem just and proper.

## JURY DEMAND

**PLAINTIFF DEMANDS A JURY ON ALL CLAIMS SO TRIABLE.**

Dated: February 12, 2016                    Respectfully submitted,

                                            /s/ Michael J. Freed
                                            Michael J. Freed
                                            mfreed@fklmlaw.com
                                            FREED KANNER LONDON & MILLEN LLC
                                            2201 Waukegan Road, Suite 130
                                            Bannockburn, IL 60015
                                            Tel: (224) 632-4500
                                            Fax: (224) 632-4521

                                            /s/ Thomas V. Urmy
                                            Thomas V. Urmy
                                            turmy@shulaw.com
                                            *Pro Hac Vice application forthcoming*
                                            Ian J. McLoughlin
                                            imcloughlin@shulaw.com
                                            *Pro Hac Vice application forthcoming*
                                            SHAPIRO HABER & URMY LLP
                                            53 State Street, 13th Floor
                                            Boston, MA 02109
                                            Tel: (617) 439-3939
                                            Fax: (617) 439-0134

                                            /s/ Adam J. Shafran
                                            Adam J. Shafran
                                            ashafran@rflawyers.com
                                            *Pro Hac Vice application forthcoming*
                                            Jonathon D. Friedmann
                                            jfriedmann@rflawyers.com
                                            *Pro Hac Vice application forthcoming*
                                            Rudolph Friedmann LLP
                                            92 State Street
                                            Boston, MA 02109
                                            Tel: (617) 723-7700
                                            Fax: (617) 227-0313